UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MILTON B. SCOTT,<br>　　　　　Plaintiff,<br>　　v.<br>GARY SWARTHOUT,<br>　　　　　Defendant. | Case No. 12-cv-04901-VC<br><br>**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS** |

**I.**

In this habeas petition, Milton Scott asserts that his first-degree murder conviction was obtained in violation of, among other things, his Sixth Amendment right to effective assistance of counsel. This is not an easy case—the performance of Scott's lawyer was clearly deficient, and the lawyer's failures had a significant effect on the evidence heard by the jury. But the Court cannot grant habeas relief unless it is convinced that any fairminded judge would agree that Scott's Sixth Amendment right to effective assistance of counsel was violated. Because reasonable minds could differ about whether Scott was prejudiced as a result of his lawyer's deficient performance, the petition is denied.

**II.**

On March 12, 2005, Scott shot and killed Lemech Nelson outside a liquor store in San Pablo, California. Although much of the evidence at trial was disputed, the following basic facts were not: (i) Scott and Nelson had a history of animosity; (ii) Scott and Nelson encountered one another in the liquor store; (ii) Scott left the store, got into a friend's car, and borrowed the friend's gun; (iii) Scott got out, saw Nelson getting into his own car, and approached Nelson with the gun drawn; and (iv) Scott fired multiple shots at Nelson, killing him.

In August 2007, the Contra Costa County District Attorney's Office charged Scott with

1  first-degree murder.  Scott was tried three times.  The first two trials resulted in hung juries and
2  the third resulted in a conviction.  Most relevant for purposes of this habeas case is what happened
3  in the first and third trials.  Some highlights from those trials are discussed in this section; more
4  details are set forth in Section IV(B).

## A.

In the first trial, the prosecution called Marcus Combs – the friend whose gun Scott used to kill Nelson – to testify.  The prosecution was hoping to elicit testimony from Combs that Scott indeed shot Nelson that night, because that is what Combs had told the San Pablo police in an interview.  But Combs testified that he did not know anything about Nelson's murder, and that he did not recall where he was on the night of the shooting.  The prosecutor asked Combs if police officers had previously questioned him about the incident.  Combs responded that they did question him, that they asked him essentially the same questions the prosecutor was asking him on the stand, and that he gave them essentially the same answers, namely, that he did not know anything about the shooting or Scott's alleged involvement in it.  The prosecutor did not impeach Combs with his prior statement to the police.  Scott's attorney then cross-examined Combs briefly to confirm that Combs did not know anything about the shooting.  When Combs finished testifying, he was excused, but was informed that he was subject to recall.  Ex. 3, ART, Vol. 3A 591.[1]

After Combs' testimony but before the prosecution finished presenting its case, the district attorney's office learned that the San Pablo police officers had recorded their interview with Combs.  The prosecution disclosed the tape to Scott's attorney, who objected to its admission on the ground that the disclosure came too late.  The trial court overruled the objection.  The court concluded that the late disclosure of the recording did not prejudice Scott because, even though defense counsel did not know the exact content of Combs' statement, counsel was already aware, at a minimum, that Combs had given the police a statement implicating Scott in the shooting.  Ex.

---

[1] The Court is citing to the exhibits lodged by the State in support of its Answer to this federal habeas petition.  *See* Doc. No. 9, "Notice of Lodging Exhibits with Court."  The Court uses the following abbreviations in citing to the record:  "CT" for Clerk's Transcript, "RT" for Reporter's Transcript, and "ART" for Augmented Reporter's Transcript.

3.

Despite the trial court's ruling, the prosecution chose not to introduce the tape into evidence. Instead, the prosecution called Matt Wasteney, an investigator from the district attorney's office, to testify about the contents of the tape. Wasteney had not participated in the Combs police interview, nor was he present when it happened. Wasteney merely listened to the tape after the prosecution discovered it, and told the jury what he heard. Wasteney told the jury that he heard Combs tell the police the following things: (i) Scott shot Nelson at the liquor store that night; (ii) Scott, Combs, and a third companion (Alfred Griego) were driving away from the liquor store when Scott turned the vehicle around and decided to confront Nelson with a gun; (iii) Combs implored Scott not to confront Nelson; (iv) the altercation was related to prior animosity between Scott and Nelson; and (v) Scott shot and killed Nelson. On cross-examination, Wasteney conceded that Combs told the police he was drunk that night. And Wasteney conceded that Combs repeatedly asked the police for money in exchange for his statement. Wasteney also confirmed that the police in fact paid Combs for providing the statement. Although Scott's lawyer had previously objected to the tape on the ground that the prosecution disclosed it too late, he did not challenge the admissibility of Wasteney's testimony on any grounds. Ex. 3, ART, Vols. 3A and 4A.

Scott testified at the first trial. Although his attorney had promised an alibi defense during opening statements, Scott admitted on the stand that he'd shot and killed Nelson outside the liquor store. Scott testified that Nelson had harassed him and threatened to kill him on prior occasions, and that on the night of the killing Nelson whispered to Scott in the liquor store, "you and your son are dead." Scott testified to feeling a combination of extreme fear and rage, which was compounded by the fact that Nelson had not merely threatened Scott, but had also threatened his infant son, whose location (five minutes from the liquor store) was known to Nelson. Scott testified that after he got in the car to drive away, he borrowed Combs' gun, got back out of the car, and approached Nelson, who was now getting into his own car after having left the liquor store. According to Scott, Nelson looked at him and began to make a move into his car, as if he was reaching for a gun. This, according to Scott, is when he shot Nelson multiple times, killing

1    him. Scott emphasized during his testimony that he was frightened, angry, and confused during
2    the whole incident, and that he acted out of fear for his son's life. Ex. 3, ART, Vol. 4A.
3        The jury also saw video footage from the liquor store's security cameras. The footage
4    showed Scott and Nelson in the liquor store minutes before the shooting and part of the shooting
5    itself. *See* Doc. No. 31.
6        The trial court instructed the jury on first-degree murder, second-degree murder,
7    manslaughter and self-defense. Ex. 1, Vol. 3 CT 621-51. During deliberations, the jury sent the
8    judge a note asking for a transcript or a recording of Combs' interview with the police. The judge
9    sent a note back explaining that the recording was not in evidence. Ex. 1, Vol. 2 CT 523. The
10   jury could not reach a decision whether to convict Scott of first-degree murder. Ex. 1, Vol. 2 CT
11   590.

## B.

13   The second trial ended with a hung jury as well (this time because the jury could not agree
14   whether Scott was guilty or not guilty on any charge). Ex. 1, Vol. 4 CT 1004 (note from jury),
15   1006 (mistrial declared). The prosecution tried Scott a third time. When the prosecution brought
16   Combs to the stand in the third trial, he refused to answer any questions, asserting his Fifth
17   Amendment privilege against self-incrimination. The prosecution then introduced Combs'
18   testimony from the first trial (in which Combs denied knowledge of the shooting), and played the
19   tape of the police interview to "impeach" that testimony from the first trial. By listening to the
20   tape, the jury heard Combs tell the police the following things, which are similar to what
21   Wasteney told the first jury: (i) Scott shot Nelson at the liquor store that night; (ii) Scott, Combs,
22   and Griego were driving away from the liquor store when Scott decided to get back out of the car
23   and confront Nelson with a gun; (iii) Combs implored Scott not to confront Nelson; (iv) the
24   altercation was related to prior animosity between Scott and Nelson; and (v) Scott shot Nelson.
25   On the tape, Combs made conflicting statements to the police about how drunk he was that night
26   and repeatedly asked the police for money in exchange for his statement. The third jury also heard
27   Combs tell the police something Wasteney had not relayed to the first jury, namely, that Scott had
28   shot Nelson in the leg on a prior occasion. Scott's defense lawyer did not object to the tape's

admission; he merely requested that the jury hear the entire tape, rather than the prosecutor's selected portions of it. Ex. 2, RT 247-49.

Scott again testified in his defense, and provided substantially the same testimony as in his first trial, namely, that he was angry and frightened, that he wasn't thinking clearly, and that his actions were driven primarily by fear for his infant son's life. The prosecutor cross-examined Scott extensively about how Scott's lawyer had originally presented a false alibi defense at the first trial. The prosecutor also cross-examined Scott extensively on the fact that his self-defense testimony in the third trial seemed more tailored and detailed than in the first trial, despite the fact that the third trial was further in time from the shooting. Ex. 2, RT 547-634.

The jury also saw the same video footage from the liquor store's security cameras, showing Scott and Nelson in the liquor store minutes before the shooting and part of the shooting itself. *See* Doc. No. 31. The video, as well as other evidence considered by the jury, will be described in further detail in Section IV(B). But it is indisputable that the most important evidence adduced at the third trial was Scott's testimony, the video footage from the liquor store, and the Combs tape.

The jury convicted Scott of first-degree murder.

## C.

On direct appeal, in addition to other claims not relevant to this federal habeas petition, Scott argued that: (1) the trial court violated his due process rights by admitting inflammatory rap lyrics he had written; (2) the prosecutor committed misconduct when he argued in closing that Scott had been lying in wait for Nelson outside the liquor store; and (3) the trial court violated his constitutional right to confrontation by admitting certain statements by Alfred Griego to the police, and alternatively, that his lawyer was ineffective for failing to object to Griego's statements. Ex. 6.

Before receiving a ruling on his direct appeal, Scott filed a petition for writ of habeas corpus in the California Court of Appeal. This petition raised a claim that Scott's counsel's failure to object to the Combs tape violated his right to effective assistance of counsel. Ex. 12.

On July 25, 2011, the California Court of Appeal affirmed the judgment of conviction in a written opinion, Ex. 9, and summarily denied his petition for habeas relief, Ex. 15.

1   Scott then filed a petition for review with the California Supreme Court in the direct

2   appeal, as well as a habeas petition with that court. On October 26, 2011, the California Supreme

3   Court denied the petition for review, and summarily denied the habeas petition. Exs. 11 and 17.

4   Scott timely filed this petition for federal habeas relief on September 19, 2012. The case

5   was reassigned to the undersigned judge on April 17, 2014. On May 20, 2014, the Court

6   appointed counsel for Scott. *See* Doc. No. 12. At the Court's direction, the parties submitted

7   supplemental briefs, and Scott was permitted to file an amended petition. A hearing on the

8   amended petition was held on October 16, 2014.

## III.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas relief only if: (i) the state court's ruling was "contrary to, or involved an unreasonable application of," clearly established Supreme Court precedent; or (ii) the state court's ruling "was based on an unreasonable determination of the facts" in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). This is a highly deferential standard for evaluating state court rulings: "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 786-87 (2011).

## IV.

Scott's primary contention on habeas is that he received ineffective assistance of counsel because his lawyer failed to object to the admission of the Combs tape in the third trial.

Under *Strickland v. Washington*, 466 U.S. 668, 688 (1984), a defendant is denied his constitutional right to effective assistance of counsel when: (1) counsel performs deficiently; and (2) the deficient performance prejudiced the defense. Deficient performance occurs when the representation falls "below an objective standard of reasonableness . . . . under prevailing professional norms." *Id*. at 687-88. Prejudice occurs where, "but for counsel's unprofessional errors," there is a "reasonable probability that . . . the result of the proceeding would have been

6

different."  *Id*. at 694.

For purposes of habeas review by a federal court, the question is not merely whether the petitioner received ineffective assistance of counsel.  It is whether the state court's conclusion that the petitioner's Sixth Amendment rights were *not* violated was "so lacking in justification that [the court committed] an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington*, 131 S.Ct. at 786-87.  In other words, to grant Scott's habeas petition based on ineffective assistance of counsel, this Court must be convinced that any reasonable judge would be compelled to conclude that the performance of Scott's counsel was deficient and that Scott was prejudiced as a result.

## A.

Scott argues that his defense lawyer's failure to object to the Combs tape constituted deficient performance because the tape's admission was obviously barred by the Confrontation Clause and by the California Evidence Code.  Although it is not obvious that admission of the tape violated Scott's confrontation rights, it is quite clear that the tape was admitted in violation of the California Evidence Code.  The failure to object to it therefore constituted deficient performance.

With respect to the Confrontation Clause, there's no question the Combs tape was an out-of-court statement, and there's no question the statement was "testimonial" within the meaning of *Crawford v. Washington*, 541 U.S. 36 (2003).  Accordingly, the tape could only be admitted consistent with the Confrontation Clause if Scott previously had an opportunity to cross-examine Combs on the contents of the statement.  *Id.* at 59.  Scott argues he lacked this opportunity in the first trial even though Combs testified at that trial, since the prosecution did not produce the tape to defense counsel until after Combs left the stand.  This argument is correct up to a point – at the time Combs testified, the defense did not have an opportunity to cross-examine him about the tape.  The State is wrong to argue that Scott had an "opportunity" to cross-examine Combs based merely on defense counsel's general knowledge that Combs had spoken with the police, especially where the prosecution did not introduce Combs' prior inconsistent statement on direct examination.  *Cf. Douglas v. Alabama*, 380 U.S. 415 (1965).

But Combs was excused subject to recall, and once the prosecution put on evidence of the

prior statement (in the form of Wasteney's testimony), Scott's lawyer could have recalled Combs to cross-examine him about his prior statement, including the contents of the police tape, which was in defense counsel's possession by that point. Better yet, Scott's counsel could have insisted that the prosecution produce Combs and assure his availability for cross-examination before Wasteney took the stand. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009) (holding that the government must produce the declarant for cross-examination to protect the defendant's right to confrontation). Therefore, it appears that Scott had an "opportunity" to cross-examine Combs on the police tape in the first trial, which means his lawyer's failure to make a Confrontation Clause objection did not constitute deficient performance and this argument cannot form the basis for habeas relief. *See Crawford*, 541 U.S. at 59 n.9 ("The [Confrontation] Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it."); *United States v. Pursley*, 577 F.3d 1204, 1225 (10th Cir. 2009) (holding that the defendant retained the opportunity to confront the witness, because the witness was subject to recall, and his "failure to seize this opportunity at trial demolishes his Sixth Amendment claim"); *Jones v. Galaza*, No. C-03-00079 JSW (PR), 2007 WL 3101640, at *20 (N.D. Cal. Oct. 22, 2007) (holding that reading a witness's prior testimony into the record did not violate the petitioner's confrontation rights where the witness testified at trial, was cross-examined, and was subject to recall for additional cross-examination).

However, it is obvious – and the State conceded as much at the hearing on this habeas petition – that the trial judge in Scott's third trial could not have admitted the Combs tape over an objection based on California Evidence Code Section 1294. This section governs the situation in which a witness is unavailable at a proceeding, but testified in a prior proceeding and also made a previous statement that was inconsistent with that testimony. Section 1294 provides that, in this circumstance, a prior inconsistent statement may be admitted, but only if the prior inconsistent statement was "properly admitted" in the prior proceeding, and even then only if the prior inconsistent statement takes the form of a video or a transcript. *See* Cal. Evid. Code § 1294(a). The Combs police tape did not satisfy these requirements. Although Combs testified at the prior proceeding and was unavailable in the subsequent proceeding because he took the Fifth, the tape

was not introduced in the first proceeding at all; therefore it obviously could not have been "properly admitted" in the first proceeding. *See People v. Martinez*, 113 Cal. App. 4th 400, 409 (Cal. Ct. App. 2003) (holding that Section 1294 requires the recorded statement to have been introduced at a prior hearing where the witness actually testified). Nor in any event was the Combs tape a videotape or a transcript as contemplated by the statute.

While conceding that California Evidence Code Section 1294 would have required the judge to sustain an objection by Scott's lawyer to the tape's admission at the third trial, the State speculates that defense counsel's failure to object must have been a strategic decision. Specifically, the State argues that Scott's lawyer was faced with two unpleasant choices – admission of the Combs tape or admission of a transcript of Wasteney's testimony from the first trial, in which Wasteney described what he heard on the tape. Faced with these choices, the State argues, Scott's lawyer could have reasonably opted for admission of the tape itself, so the jury could hear Combs' dialogue with the San Pablo police in its unvarnished form, rather than hearing someone read the transcript of a DA Inspector's testimony about the interview, which, after all, came with a gloss.

But the transcript of Wasteney's testimony was no more admissible at the third trial than the Combs tape itself, so there is no basis for the State's speculation that Scott's lawyer made a strategic choice by failing to object to the tape. In fact, Wasteney's testimony should not even have been allowed in the first trial, because it violated California's "secondary evidence rule." Wasteney was not present at the police interview with Combs; he had no personal knowledge of the interview and could not testify about what he heard or saw personally. He merely testified about the contents of the tape after listening to it. His testimony was therefore improper – Scott's lawyer should have objected to it in the first trial, and the trial judge would have been required to sustain the objection. *See* Cal. Evid. Code § 1523(a) (Oral testimony is not admissible to prove the contents of a "writing," except in limited circumstances that are not present here); *People v. Kirk*, 43 Cal. App. 3d 921, 928 (1974) (tape recording counts as a "writing" within the meaning of the secondary evidence rule); *see also People v. Cleland*, 134 Cal. Rptr. 2d 479, 485 n.4 (Cal. Ct. Appeal. 2003) (cert. for partial publication) (Detective's testimony about a tape recording violated

9

section 1523 of the Evidence Code because oral testimony is not admissible to prove the contents of a tape). Nor would the failure of Scott's lawyer to object to Wasteney's testimony at the first trial have precluded a successful objection at the third trial, because prior testimony admitted in a subsequent proceeding is subject to the same objections that could have been raised originally. *See* Cal. Evid. Code § 1291(b).[2]

Accordingly, there was no strategic basis for the failure to object to admission of the Combs tape in the third trial. Rather, because he could have kept out Combs' prior statement entirely, Scott's lawyer's failure to object was an obvious mistake, and one that meant that his performance fell below an objective standard of reasonableness.[3]

## B.

The next question is whether defense counsel's failure to object to the Combs tape prejudiced Scott, that is, whether there is a reasonable probability the jury would not have convicted him of first-degree murder had the tape been excluded. And because this is a federal habeas case governed by AEDPA, the question is not merely whether there was prejudice, but whether the answer to the prejudice question is such an obvious "yes" that any fairminded judge would be compelled to find it. *Harrington*, 131 S. Ct. at 78687. After reviewing the evidence other than the Combs tape adduced in the third trial, the Court cannot conclude that every reasonable judge would be compelled to find prejudice. To the contrary, whether there is a reasonable probability that the jury would have convicted Scott of first-degree murder absent the

---

[2] The transcript of Wasteney's prior testimony would also have been subject to exclusion because there was no indication he was "unavailable" in the third trial, as is required for the admission of prior testimony. *See* Cal. Evid. Code § 1291(a). But that is beside the point, because even if Wasteney had been unavailable for the third trial, his prior testimony could not have been admitted over an objection based on the secondary evidence rule. By the same token, if Wasteney were available for the third trial and the prosecution attempted to call him to testify in person about the contents of the tape he listened to, this could not have been allowed.

[3] Incidentally, the State contends that Scott's argument about the inadmissibility of Wasteney's prior testimony at the third trial is a "new claim" that has not been exhausted. But Scott makes this argument only in *reply* to the State's *response* to Scott's contention that his lawyer's failure to object to the police tape constituted deficient performance. The State argues that Scott's lawyer's performance was not deficient because it could have been a strategic decision in light of the admissibility of Wasteney's prior testimony. Scott has explained in reply how Wasteney's tape was not admissible. This is not a new claim; it is an explanation of why the State's argument does not defeat the original claim.

1  Combs tape is a close question.

2  The trial judge instructed the jury on the difference between first-degree and second-degree
3  murder as follows:

> If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation so that it must have been formed upon preexisting reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree.
>
> The law does not undertake to measure in units of time the length of period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals under varying circumstances.
>
> The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first degree.
>
> To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice, and having in mind the consequences, he decides to and does kill.
>
> Murder of the second degree is also the unlawful killing of a human being with malice aforethought when the perpetrator intended unlawfully to kill a human being, but the evidence is insufficient to prove deliberation and premeditation.

Ex. 2, RT 677-78. Putting aside the Combs tape, the jury heard a fair amount of evidence to support a finding of deliberation and premeditation. As a preliminary matter, several significant facts were undisputed at trial – facts that Scott conceded in his own testimony: Scott and Nelson had a history of animosity. They ran into one another at a liquor store. Scott left the store first and got into Combs' car. Scott could have driven away. But instead Scott borrowed Combs' gun, got out of the car, approached Nelson as Nelson was getting into his own car, and shot at him multiple times. While these undisputed facts might arguably not be enough on their own, they

certainly build a solid circumstantial foundation for a first-degree murder conviction.

Scott's own testimony arguably built on that foundation. Although he testified that Nelson threw him into a state of anger and terror by whispering "you and your son are dead" in the liquor store, and although he testified he believed Nelson was reaching for a gun as he was being approached by Scott, the jury could well have concluded, after hearing the totality of Scott's testimony, that this was an elaborate lie. During cross-examination, the jury learned that Scott's lawyer presented a false alibi defense during opening statements at the first trial, namely, that Scott was in Hayward at the time of the shooting, meeting with a "Mr. Wyley," who was allegedly the head of a recording studio. RT 547-48.[4] What's more, Scott admitted on cross examination that he was involved in concocting the false alibi, that he spoke with Mr. Wyley about testifying in support of the false alibi, and that he hoped the jury would buy into the story. RT 548. And now Scott was telling the jury that he acted in self-defense when he went after Nelson with the gun, which the jury could easily have concluded was another lie. Thus, the revelations about the false alibi defense could have made it seem even less plausible to the jury that Scott acted without premeditation than if Scott had not testified at all.[5]

The prosecutor effectively cross-examined Scott in other ways. At several points, the prosecutor was able to show that Scott's self-defense story at the third trial was more carefully crafted than in the prior trials. Most noteworthy was Scott's testimony in the third trial that he believed Nelson was reaching for a submachine gun, compared to his prior testimony that he didn't know what Nelson was reaching for, but that it might have been a gun. RT 603-05. This could have made the jury still more apt to conclude that Scott was merely telling whatever story he believed gave him the best chance at an acquittal, without regard for the truth.

The video recording of the incident could also have contributed to such a conclusion. The

---

[4] Scott's lawyer did not object to this line of questioning. In post-conviction proceedings, Scott has not raised his lawyer's failure to object.
[5] One interesting question is whether exclusion of the Combs tape would have allowed Scott to avoid taking the stand. But the parties agreed at the hearing on this habeas petition that the Court should assume, for purposes of the prejudice analysis, that Scott would still have taken the stand (as opposed to, for example, presenting a false alibi defense through his lawyer and other witnesses).

video showed the entire period where Scott and Nelson were together in the store before the shooting. It was some time during this period that Nelson allegedly whispered his threat to Scott and his son. But while Scott testified that this threat made him terribly angry and filled him with fear, there is no indication of that in the video. To the contrary, throughout his time in the store Scott appeared calm. The video shows the only point at which the two men were close enough that Nelson could have whispered to Scott, and Scott did not appear to react in any way. Indeed, there is no indication in the video that Nelson said anything to Scott at all. *See* Doc. No. 31. Furthermore, the video shows that more than four minutes elapsed between when Scott left the store and when he shot and killed Nelson. The jury could have concluded, as the prosecutor argued in his closing, that this was enough time for Scott to have decided to kill Nelson, and to wait for Nelson to come out of the store before doing so.

Scott argues that this evidence pales in comparison to the Combs tape, because the tape is the only direct evidence that Scott acted with premeditation. In particular, Scott emphasizes, the Combs tape revealed that: (i) Combs implored Scott not to shoot Nelson (which shows that Scott was given an opportunity to reflect on the matter); and (ii) Scott shot Nelson in the leg on a prior occasion (which supports a finding of premeditation by showing that Scott was the aggressor in his ongoing rivalry with Nelson).[6] This argument is not unreasonable; the Combs tape was certainly significant. But it was perhaps not as significant as Scott contends. For example, Scott argues that absent the Combs tape the jury would not have been able to conclude that Scott was the aggressor in his rivalry with Nelson. Scott notes that although several other people gave testimony to support a conclusion that Scott was the aggressor, those people were all Nelson's friends or family members, whereas Scott's friends or family members testified that Nelson was the aggressor. Absent the Combs tape, Scott contends, the evidence of the rivalry would have been in equipoise. But Scott's own testimony revealed that he'd previously lined up a witness to

---

[6] Although other witnesses testified that Nelson told them he'd been shot in the leg by Scott, the Court gave a limiting instruction each time, explaining to the jury that it could consider the testimony only as to Nelson's state of mind (i.e., that Nelson believed Scott had shot him in the leg) and not for the truth (i.e., that Scott had actually shot him). But Combs' statements came in for their truth, so the jury was free to conclude that Scott had in fact shot Nelson before.

13

support a false alibi defense. Following this revelation, the jury could easily have concluded that Scott similarly convinced his friends and family members to testify that Nelson was the aggressor in their rivalry. There was no comparable reason to conclude that the witnesses aligned with Nelson were lying. To the contrary, their testimony was more credible even absent the Combs tape. The testimony of Nelson's friends and family was that Nelson moved to Michigan because he was afraid of Scott. *See, e.g.*, RT 113-17, 165-66. And it is undisputed that Nelson in fact lived in Michigan at the time of the shooting, and was only back in California for a visit. This bolsters the credibility of the witnesses who claimed Scott was the aggressor, and undermines the credibility of those who gave testimony suggesting Nelson was the aggressor. Moreover, Scott admitted on the stand that he had pulled a gun on Nelson on a prior occasion and that he had never seen Nelson with a gun − admissions that could have further supported a finding by the jury that Scott was the aggressor. RT 596-600.

Scott also notes that the jury in the first trial could not agree whether he was guilty of first-degree murder. He argues that the only significant difference between the evidence in the first and third trials was that, in the third trial, the jury heard the Combs tape, meaning that there is significant doubt about whether the jury would have convicted him of first-degree murder absent the tape. Again, this argument is not unreasonable. Recall that the first jury sent the trial judge a note asking for a recording or transcript of the Combs interview. This suggests that at least some jurors in the first trial were uncomfortable relying on Wasteney's account of the interview, and that the actual tape would have made a big difference. But there were other differences between the first and third trials that could have made the difference as well. For example, in the first trial, the prosecutor barely cross-examined Scott on the false alibi, and obtained no concession from Scott that he had orchestrated the defense. In the third trial, the prosecutor not only obtained that concession; he belabored the false alibi issue, using it to convey to the jury during cross-examination that Scott was lying about everything. And the prosecutor pointed to differences in Scott's testimony between the first and third trials, focusing in particular on points that Scott seemed to recall in more detail in the third trial, to show that Scott was refining his testimony to tell the best story possible. Overall, the prosecutor's cross-examination of Scott was far more

effective in the third trial than in the first.

In sum, even without the Combs tape, the jury could have come away convinced that Scott was telling them a calculated, elaborate lie, designed to shoehorn a self-defense story into the confines of the evidence he could not avoid. That, combined with the circumstantial evidence of first-degree murder that already existed, could well have caused the jury to reach a first-degree murder verdict. Whether there is a "reasonable probability" that the jury would have reached a different verdict if not for counsel's failure to object to the Combs tape is a close question, but given the weight of the other evidence in the case, a reasonable judge could certainly conclude there is not. And because reasonable minds could differ on that question, the Court cannot conclude under AEDPA that any reasonable judge would be compelled to find prejudice.

## V.

Scott next argues that his Sixth Amendment right to confrontation was violated by the admission of a prior statement by Alfred Griego – the third person with Scott and Combs at the liquor store. Scott also argues that his lawyer was constitutionally ineffective for failing to object to the statement's admission. The parties agree that Scott's freestanding Confrontation Clause claim is analyzed under the harmless error standard and is subject to *de novo* review because no state court reached the merits of this claim. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). The parties also agree that Scott's ineffective assistance of counsel claim, which is analyzed under *Strickland*, is governed by AEDPA. *See Strickland*, 466 U.S. at 694. Under either standard, Griego's statement was of such minor consequence that it does not call into question the jury's verdict.

At the third trial, Griego took the stand but refused to answer any questions, repeatedly saying, "I won't answer" or "I can't answer." RT 218-19. The trial court held him in contempt, and finding him unavailable, admitted his testimony from the first trial. In that testimony, Griego also refused to answer questions, except that when the prosecutor asked him if he was afraid, he answered "no." RT 300. To impeach the testimony that he was not afraid, the prosecution called to the stand (in the first trial) an officer who had previously interviewed Griego, and the officer testified to Griego's statements during the police interview. In the third trial, again to "impeach"

Griego's testimony, the prosecution read the officer's prior testimony to the jury, including the following: "During questioning, Mr. Griego stated, 'I could probably get killed for this too.' He went on to ask, 'Is this gonna leak because he's out,' pointing at Mr. Scott's picture. 'Is he gonna know I said something?'" RT 307.  These prior out-of-court statements were admitted to show that Griego was refusing to answer questions in the third trial because he was afraid of retribution from Scott.  RT 799.

       Scott argues that the statement "I could probably get killed for this too" was prejudicial because it "squarely implicated Scott in the crime."  Supp. Br. at 3-4.  Given the other evidence before the jury, this statement is so trivial that, even when considered along with the potential impact of the Combs tape, it is not possible to conclude that it influenced the jury's verdict.  Scott was already "squarely implicated" in the crime, including by his own testimony that he killed Nelson.  As discussed, the other evidence in the case was enough for the jury to conclude beyond a reasonable doubt that there was premeditation.  And surely the jury was not surprised that Griego might be scared of Nelson, given all the other evidence in the case, and given Griego's repeated statements that he "can't" answer the questions.  Therefore, even assuming Scott's claim based on Griego's statement is not procedurally defaulted, and even assuming admission of that statement violated Scott's right to confrontation, the statement was of such limited consequence that it cannot have had a "substantial or injurious effect or influence" on the jury's verdict.  Furthermore, assuming Scott's lawyer's performance in failing to object was "deficient" within the meaning of *Strickland*, the statement does not add, in any meaningful way, to the concern that the jury would have reached a different verdict absent the out-of-court statements.

## VI.

       Scott makes two other arguments for habeas relief, but they merit less discussion than the Combs tape or even Griego's statements.  First, Scott contends the trial court violated his federal due process rights by admitting, over his lawyer's objection, some rap lyrics he'd written.  Included in those lyrics was the following passage:

> You niggas wrong, man, calling me with death threats, hollering about your baby momma, knowing we just met.  Don't get your chest wet.  I can't believe this nigga claiming Rich-town.  Somebody

16

> run a set check.  Nigga, your best bet to charge it to the game.  You don't want to be my target when I aim over a hoe.  You can get with her.  She's just a bitch, nigga.  She'll be back, though that hoe a switch hitter.

RT 618.  But even if the trial court erred under state law in admitting these lyrics, they are not so lacking in relevance as to trigger a federal due process inquiry.  *See Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (federal due process rights only implicated by erroneous admission of evidence if jury could draw no permissible inference from it).  A jury could permissibly conclude that these lyrics were directed at Nelson, given their similarity to the real-life rivalry between Scott and Nelson (which involved a woman who was romantically involved with both of them and who had been impregnated by Nelson).  And therefore the lyrics have some relevance to the question whether Nelson or Scott was the aggressor in the rivalry, and whether Scott had previously harbored thoughts of killing Nelson.  Accordingly, the trial court's decision to admit the lyrics, and the appellate court's decision to uphold that ruling on direct appeal, involved neither an unreasonable application of federal law nor an unreasonable application of the facts.

Second, Scott argues the prosecutor committed misconduct, again in violation of his federal due process rights, by asserting in closing arguments, without evidentiary support, that Scott had been "lying in wait" for Nelson outside the liquor store.  But, for the reasons stated by the California Court of Appeal on direct review, one could infer from the evidence that Scott intended to kill Nelson from the moment he left the liquor store, and that he was waiting for Nelson to exit the store before doing so, despite Scott's testimony to the contrary.  *See* Ex. 9, Opinion by California Court of Appeal at 24-25.  At a minimum, the state court rulings on this issue cannot be said to involve an unreasonable application of federal law or an unreasonable application of the facts.

## VII.

The petition for a writ of habeas corpus is denied.  A certificate of appealability is granted for the claims relating to the out-of-court statements admitted at trial and the failure of Scott's lawyer to object to the admission of those statements.  28 U.S.C. § 2253(c)(2), (3).  A certificate of appealability is denied for the claim relating to the admission of the rap lyrics and the claim of prosecutorial misconduct.

17

**IT IS SO ORDERED**.

Dated: January 16, 2015


_____
VINCE CHHABRIA
United States District Judge